**Pursuant to Ind.Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**

ATTORNEY FOR APPELLANT:

**AMY KAROZOS**
Greenwood, Indiana

ATTORNEYS FOR APPELLEE:

**ROBERT J. HENKE**
DCS Central Administration

**PATRICK M. RHODES**
Indiana Department of Child Services
Indianapolis, Indiana

**FILED**
Oct 26 2012, 9:20 am

CLERK
of the supreme court,
court of appeals and
tax court

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| IN RE THE INVOLUNTARY TERMINATION OF THE PARENT-CHILD RELATIONSHIP OF A.P.: | ) ) ) |
| | ) |
| T.P. | ) |
| | ) |
| Appellant-Respondent, | ) |
| | ) |
| vs. | )      No. 49A02-1201-JT-28 |
| | ) |
| THE INDIANA DEPARTMENT OF CHILD SERVICES, | ) ) |
| | ) |
| Appellee-Petitioner, | ) |
| | ) |
| and | ) |
| | ) |
| CHILD ADVOCATES, INC. | ) |
| | ) |
| Guardian Ad Litem. | ) |

**October 26, 2012**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**FRIEDLANDER, Judge**

T.P. (Father) appeals the involuntary termination of his parental rights to his child, A.P. Father challenges the sufficiency of the evidence supporting the juvenile court's judgment.

We affirm.

Father is the biological father of A.P., born in July 2009.[1] The facts most favorable to the trial court's judgment reveal that A.P. was removed from the family home and placed in relative foster care in July 2010 after the local Marion County office of the Indiana Department of Child Services (DCS) substantiated a report alleging domestic violence and substance abuse in the family home. At the time of A.P.'s removal, Father was incarcerated on domestic battery and battery charges relating to Mother, and Mother was already working

---

[1] A.P.'s biological mother, An.P. (Mother), signed a consent for adoption of A.P. by the maternal grandfather and does not participate in this appeal. In addition, three of A.P.'s half-siblings, who were also removed from the family home with A.P., are not Father's biological children and are not subject to this appeal. We therefore limit our recitation of the facts to those pertinent solely to Father's appeal of the juvenile court's judgment terminating Father's parental rights to A.P.

with DCS through an Informal Adjustment to address her issues with substance abuse.[2] DCS thereafter filed a petition alleging that A.P. was a child in need of services (CHINS).

An evidentiary hearing on the CHINS petition was eventually held in November 2010. During the CHINS hearing, Father signed and submitted an Admission and Agreement on Services (Agreed Entry), acknowledging that he had failed to provide A.P. with a safe and appropriate living environment, free from domestic violence. The Agreed Entry further stated that Father agreed to participate in and successfully complete a variety of tasks and services including: (1) maintaining a legal and stable source of income sufficient to support the family; (2) participating in home-based counseling; (3) submitting to random drug screens; and (4) successfully completing a domestic violence assessment, substance abuse assessment, and psychological evaluation and follow any and all resulting treatment recommendations.

The juvenile court accepted the Agreed Entry and adjudicated A.P. a CHINS. The court thereafter proceeded to disposition the same day and entered an order formally removing A.P. from Father's care and custody. A Participation Decree was also entered directing Father to successfully complete a variety of tasks and services designed to improve his parenting skills and to facilitate reunification with A.P. In addition to the services set forth in the Agreed Entry, Father was ordered to, among other things: (1) refrain from all criminal activity, acts of domestic violence, and drug use; (2) maintain clean, safe, and appropriate housing at all times; and (3) exercise regular supervised visits with A.P.

Father's participation in court-ordered services was inconsistent and ultimately

---

[2] A Program of Informal Adjustment is a negotiated agreement between a family and DCS whereby the family agrees to participate in various services in an effort to prevent the child/children from being formally deemed

3

unsuccessful. Although he participated in domestic violence classes, Father had to be referred to the program twice for failing to regularly attend class during the first referral. Additionally, in June 2011, Father pled guilty to a new charge of domestic violence following an incident during which he bit Mother. Father eventually completed the domestic violence classes in September 2011, but DCS continued to receive reports of violent incidents occurring in the family home despite Father's completion of the program.

Father also struggled with substance abuse, testing positive for cocaine, marijuana, and alcohol throughout the underlying proceedings. Although Father underwent a substance abuse evaluation and eventually completed an intensive out-patient treatment program (IOP), he had to be referred to the IOP program twice because he stopped attending the first referral. Father also continued to use and/or sell illegal substances following his completion of the IOP. In addition, Father tested positive for cocaine in June 2011 while still working with his addictions therapist, Stephen Kramar. Father was also unsuccessfully discharged from his first referral for random drug testing because he refused to submit to twenty separate drug screen requests.

In September 2011, DCS filed a petition seeking the involuntary termination of Father's parental rights to A.P. During the termination hearing, DCS presented significant evidence establishing that although Father had completed several of the court-ordered reunification services, including an IOP and domestic violence classes, he nevertheless remained unable to demonstrate that he had achieved any long-term benefit from participating in these programs. In addition to showing that Father continued to struggle with

children in need of services. See Ind. Code 31-34-8 et seq.

4

substance abuse issues, DCS also established that Father refused to take his prescribed anti-anxiety medications, choosing instead to use alcohol in an attempt to self-medicate. Father also admitted during the termination hearing that he had smoked marijuana the day before trial.

DCS also presented evidence that Father continued to engage in violent domestic conflicts with Mother despite his completion of domestic violence classes, was convicted of new domestic violence charges during the underlying proceedings as recently as June 2011, and was involved in a physically violent altercation with Mother approximately one week prior to the termination hearing, resulting in damage to his truck. Finally, DCS presented evidence showing A.P. was happy and thriving in the pre-adoptive relative foster care home of his maternal grandfather.

At the conclusion of the termination hearing, the juvenile court took the matter under advisement. On December 19, 2012, the juvenile court entered its judgment terminating Father's parental rights to A.P. Father now appeals.

Initially, we note that when reviewing the termination of parental rights, we will not reweigh the evidence or judge the credibility of the witnesses. *In re D.D.*, 804 N.E.2d 258 (Ind. Ct. App. 2004), *trans. denied*. Instead, we consider only the evidence and reasonable inferences that are most favorable to the judgment. *Id.* In deference to the juvenile court's unique position to assess the evidence, we will set aside the court's judgment terminating a parent-child relationship only if it is clearly erroneous. *In re L.S.*, 717 N.E.2d 204 (Ind. Ct. App. 1999), *trans. denied*. Thus, if the evidence and inferences support the juvenile court's decision, we must affirm. *Id.*

Here, the juvenile court made detailed findings in its order terminating Father's parental rights to A.P. Where the juvenile court enters specific findings of fact and conclusions thereon, we apply a two-tiered standard of review. *Bester v. Lake Cnty. Office of Family & Children*, 839 N.E.2d 143 (Ind. 2005). First, we determine whether the evidence supports the findings, and second we determine whether the findings support the judgment. *Id.* "Findings are clearly erroneous only when the record contains no facts to support them either directly or by inference." *Quillen v. Quillen*, 671 N.E.2d 98, 102 (Ind. 1996). A judgment is clearly erroneous only if the findings do not support the juvenile court's conclusions or the conclusions do not support the judgment thereon. *Quillen v. Quillen*, 671 N.E.2d 98.

Initially, we recognize that the traditional right of parents to "establish a home and raise their children is protected by the Fourteenth Amendment of the United States Constitution." *In re M.B.*, 666 N.E.2d 73, 76 (Ind. Ct. App. 1996), *trans. denied*. Although parental rights are of a constitutional dimension, the law provides for the termination of these rights when parents are unable or unwilling to meet their parental responsibilities. *In re R.H.*, 892 N.E.2d 144 (Ind. Ct. App. 2008). In addition, a juvenile court must subordinate the interests of the parents to those of the child when evaluating the circumstances surrounding the termination. *In re K.S.*, 750 N.E.2d 832 (Ind. Ct. App. 2001).

Before an involuntary termination of parental rights may occur in Indiana, the State is required to allege and prove, among other things:

(B)     that one (1) of the following is true:

(i)     There is a reasonable probability that the conditions that resulted

6

in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

    (ii)    There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

    (iii)    The child has, on two (2) separate occasions, been adjudicated a child in need of services.

Ind. Code Ann. § 31-35-2-4(b)(2)(B) (West, Westlaw current with all 2012 legislation).[3] The State's burden of proof for establishing these allegations in termination cases "is one of 'clear and convincing evidence.'" *In re G.Y.*, 904 N.E.2d 1257, 1260-61 (Ind. 2009) (quoting Ind. Code Ann. § 31-37-14-2 (West, Westlaw current with all 2012 legislation)). If the court finds that the allegations in a petition described in section 4 of this chapter are true, the court *shall* terminate the parent-child relationship. I.C. § 31-35-2-8 (West, Westlaw current with all 2012 legislation).

On appeal, Father challenges the sufficiency of the evidence supporting the juvenile

---

[3] We observe that I.C. § 31-35-2-4 was amended by Pub. L. No. 48-2012 (eff. July 1, 2012). The changes to the statute became effective after the filing of the termination petition involved herein and are not applicable to this case.

court's findings as to subsection (b)(2)(B) of the termination statute cited above.[4] *See* I.C. § 31-35-2-4(b)(2). Specifically, Father claims he was "making progress" at the time of the termination hearing, and that the juvenile court's decision to terminate his parental rights was "premature and fail[ed] to consider how much progress [Father had] made in correcting the circumstances that led to [A.P.'s] removal from the home." *Appellant's Brief* at 13. Father therefore asserts he is entitled to reversal.

At the outset, we note that DCS needed to establish only one of the three requirements of subsection (b)(2)(B) by clear and convincing evidence before the juvenile court could terminate parental rights. *See In re L.V.N.*, 799 N.E.2d 63 (Ind. Ct. App. 2003). Here, the juvenile court found DCS presented sufficient evidence to satisfy the first two subsections of (b)(2)(B) of the termination statute. *See* I.C. § 31-35-2-4(b)(2)(B)(i) & (ii). Because we find it dispositive under the facts of this particular case, however, we shall consider only whether clear and convincing evidence supports the juvenile court's findings regarding subsection (b)(2)(B)(i), namely, whether there is a reasonable probability the conditions resulting in A.P.'s removal or continued placement outside Father's care will not be remedied.

In making such a determination, a juvenile court must judge a parent's fitness to care for his or her child at the time of the termination hearing, taking into consideration evidence

---

[4] Father does not challenge the sufficiency of the evidence supporting the juvenile court's findings regarding the remaining elements of Indiana's termination statute, including whether the child was removed from his care for the requisite amount of time, whether termination of parental rights is in A.P.'s best interests, and whether there is a satisfactory plan for the future care and treatment of the child. *See* I.C. §§ 31-35-2-4(b)(2)(A), (C), and (D). Father has therefore waived appellate review of these issues. *See Davis v. State*, 835 N.E.2d 1102 (Ind. Ct. App. 2005) (concluding that failure to present a cogent argument or citation to authority constitutes waiver of issue for appellate review), *trans. denied*.

8

of changed conditions. *In re J.T.*, 742 N.E.2d 509 (Ind. Ct. App. 2001), *trans. denied*. The court must also evaluate the parent's habitual patterns of conduct to determine whether there is a substantial probability of future neglect or deprivation of the child. *In re M.M.*, 733 N.E.2d 6 (Ind. Ct. App. 2000). Similarly, courts may consider evidence of a parent's prior criminal history, drug and alcohol abuse, history of neglect, failure to provide support, and lack of adequate housing and employment. *A.F. v. Marion Cnty. Office of Family & Children*, 762 N.E.2d 1244 (Ind. Ct. App. 2002), *trans. denied*. The juvenile court may also consider the services offered to the parent by a county office of the Indiana Department of Child Services and the parent's response to those services, as evidence of whether conditions will be remedied. *Id.* Finally, a juvenile court need not wait until a child is irreversibly influenced by a deficient lifestyle such that his or her physical, mental, and social growth are permanently impaired before terminating the parent-child relationship. *In re E.S.*, 762 N.E.2d 1287 (Ind. Ct. App. 2002).

Here, in determining that there is a reasonable probability the conditions resulting in A.P.'s removal and/or continued placement outside of Father's care will not be remedied, the juvenile court made detailed findings regarding Father's unresolved substance-abuse and domestic violence issues, as well as his lack of progress in improving his ability to provide a safe home for A.P. Specifically, the juvenile court found that although Father had eventually completed the court-ordered drug and alcohol assessment, as well as an IOP, his last addictions therapist, Stephen Kramer, advised that he "did not feel the completion was successful because [Father] remained in an ambivalent contemplation stage." *Appellant's Appendix* at 6. The juvenile court further determined that Father's substance abuse treatment

9

had been unsuccessful "due to [Father's] ongoing use of alcohol, marijuana[,] and cocaine. In addition, [Father] has a history of dealing illegal drugs to support himself, including during the Summer of 2011." *Id.* The court also specifically found Father "suffers from anxiety and self[-]medicates by drinking alcohol" and that he "minimizes his alcohol use." *Id.*

As for Father's unresolved domestic violence issues, the juvenile court acknowledged in its findings that, notwithstanding his struggle with "nonattendance," Father did submit to a psychological examination and eventually completed domestic violence classes. *Id.* Nevertheless, the juvenile court went on to find that it was "clear from the evidence presented that [Father] remains in a violent relationship." *Id.* The court further observed that when home-based services were "closed out" in late August 2011, "drugs and violence continued to be an ongoing issue" in Father's home. *Id*. The juvenile court thereafter indicated:

> There is a reasonable probability that the conditions that resulted in [A.P.'s] removal and continued placement outside the home will not be remedied by [Father]. Although [Father] has made the effort to complete substance abuse treatment and domestic violence classes, he still uses, and remains in a violent relationship. He has had ample time and opportunity to make progress, but has failed to do so. [DCS] would require another substance abuse program and another twenty-six week domestic violence class which evidences that [Father] is back to where he first began.

*Id.* Our review of the record leaves us convinced us that these findings are supported by abundant evidence.

During the termination hearing, DCS case manager Jonathan Robbins recommended termination of Father's parental rights. In so doing, Robbins confirmed that Father had

participated in substance-abuse treatment and domestic violence counseling. Robbins further informed the juvenile court, however, that he did not "believe that a change was made within" Father and further testified, "I don't believe the services were successful." *Transcript* at 19. When specifically questioned about the importance of Father maintaining sobriety and participating in domestic violence counseling, Robbins explained that Father's "[s]obriety" was important "in this particular case" because "there seemed to be a correlation between substance use and violence in the home." *Id.* at 14. When asked whether Father had ever progressed in services to the point of having unsupervised and/or trial in-home visits with A.P., Robbins answered in the negative and reiterated that DCS never felt that the "issues in the case regarding substance abuse [and] domestic violence ha[d] been successfully addressed to the point that we felt that [A.P.] would be safe in the home." *Id.* at 21. Robbins later confirmed that the "issues in the case that we had in the beginning are the same issues that we have now in spite of the home-based counseling and all of the other services." *Id.* at 29.

Robbins's concerns regarding Father's unresolved parenting, substance-abuse, and domestic violence issues were likewise echoed in the testimony of service providers, as well as the Guardian ad Litem (GAL). For example, home-based counselor Bruce Joray testified that Father failed to complete a majority of his treatment plan goals, attended at least one home-based counseling session "inebriated," and continued to "minimize" that his drinking was "a problem." *Id.* at 68 and 73. Similarly, addictions counselor Kramar informed the court that when Father ceased participating in group therapy, he remained in a "contemplative stage of change," meaning Father demonstrated "considerable ambivalence

11

about whether he should return to the use of alcohol or cannabis or cocaine. . . . ." *Id.* at 133 and 143. GAL Earlon Hollowell also recommended termination of Father's parental rights. In so doing, Hollowell testified that he believed termination of Father's parental rights was in A.P.'s best interests because he was not "capable of parenting [A.P.] at this time." *Id.* at 146. When asked whether he believed Father should receive more time to complete services, Hollowell answered in the negative and further explained, "I just feel like there's been enough time to[,] you know[,] show efforts of . . . making those correct steps . . . .. [W]e need to start looking at more permanency so that . . . [A.P.] can go on . . . ." *Id.* at 148.

Finally, Father's own testimony lends support to the juvenile court's findings. During the termination hearing, Father admitted that he had a history of using cocaine, marijuana, and alcohol. In fact, Father confirmed that he had used cocaine less than a month ago and had smoked marijuana "yesterday." *Id.* at 50. Father also informed the juvenile court that he sold marijuana and cocaine "to get some money for [A.P.'s] birthday" in July 2011, explaining that selling drugs "used to be my sole survivor skill." *Id.* at 49. Finally, Father admitted that he and Mother continued to be in a relationship and to engage in violent domestic disputes, thereafter describing an incident that had occurred the week before during which Mother "tore up" the family's new truck as well as another violent encounter the day before trial during which Mother scratched Father's ear and the police were called. *Id.* at 59.

As previously explained, a juvenile court must judge a parent's fitness to care for his or her children at the time of the termination hearing, taking into consideration the parent's habitual patterns of conduct to determine the probability of future neglect or deprivation of the children. *D.D.*, 804 N.E.2d 258 (Ind. Ct. App. 2004), *trans. denied*. Where a parent's

12

"pattern of conduct shows no overall progress, the court might reasonably find that under the circumstances, the problematic situation will not improve." *In re A.H.*, 832 N.E.2d 563, 570 (Ind. Ct. App. 2005). Here, Father has demonstrated a persistent unwillingness and/or inability to take the actions necessary to show he is capable of providing A.P. with the safe, stable, and drug-free home environment the child needs. Moreover, Father's arguments on appeal, including his assertions that he was denied due process of law "where he followed the case plan or Parental Participation Order, but his rights were terminated because his completion of services was not thought to be successful" amount to an impermissible invitation to reweigh the evidence. *Appellant's Brief* at 17; *see also D.D.*, 804 N.E.2d 258. We have repeatedly recognized that "simply going through the motions of receiving services alone is not sufficient" to show that conditions have been remedied if the services "do not result in the needed change, or only result in temporary change." *In re J.S.*, 906 N.E.2d 266, 234 (Ind. Ct. App. 2009).

This Court will reverse a termination of parental rights "only upon a showing of 'clear error'– that which leaves us with a definite and firm conviction that a mistake has been made." *In re A.N.J.,* 690 N.E.2d 716, 722 (Ind. Ct. App. 1997) (quoting *Egly v. Blackford Cnty. Dep't of Pub. Welfare*, 592 N.E.2d 1232, 1235 (Ind. 1992)). We find no such error here.

Judgment affirmed.

BROWN, J., and PYLE, J., concur.